The Court of Federal Claims exists to adjudicate claims for money damages against the United States. That's what this case is all about. Okay, well let's support for the moment your claim that this is an implied in fact contract under Radium Mines and that the regulation defines what the contract is. I'm trying to understand what you think is supposed to happen in a situation in which the submitted coins are, let's say, half genuine and half counterfeit. What is supposed to happen under those circumstances? Obviously, the coins can't be returned, that is the counterfeit coins can't be returned, because that would be in violation of the forfeiture statute, right? What's supposed to happen under those circumstances? Well, what's supposed to happen, as we stated very clearly in the briefs, is that the well-planned facts in the Second Amended Complaint are supposed to be given credence by the Court of Federal Claims. No, you're not addressing my question. My question is, let's assume they're half genuine and half counterfeit. What's supposed to happen? Well, if they were... They can't return the coins unless they separate them into counterfeit and genuine, right? That's correct. So under the regulation, under that hypothetical, because those are not the facts here, but under that hypothetical, if half of the coins were counterfeit and half were genuine, then the Mint would have the ability to reject the entirety of the shipment. That's what the regulations make clear, but those are not... They can't return the counterfeit coins, right? No, they wouldn't be able to return the counterfeit coins, but the problem here... What are they supposed to do? Well, they're supposed to give... You unload the truck, it's half counterfeit, half genuine. The Mint tests them and finds out half of them are counterfeit and half are genuine. What are they supposed to do? What's supposed to happen? Your Honor, they're supposed to give the participant in the program, in this case, the Portland Mint, the opportunity to challenge that determination. Okay, suppose that happens and the Portland Mint, and everybody agrees, it's half counterfeit and half genuine. What happens? At that point, under the regulations, certainly they would not return the counterfeit portion, because that's illegal property, seizable property, forfeitable property. I think if they were to use, and I'm just following your hypothetical, if they were to use a genuine portion of the coins to mint new coin roll, then they would be obligated to pay the Portland Mint. Okay, but it could be very difficult to separate the counterfeit from the genuine, right? I would agree with that. But again, I think it's important for the court to remember, which I know your honors do, that we're not at summary judgment. There has been no discovery allowed in this case. We are at the motion to dismiss. Okay, but in terms of construing the regulation, it's important to know how hypotheticals come out. And because there's a real possibility here that this was an admixture of counterfeit and genuine coins. But I mean, even the government's assay of the coins, it seems to me, appears to agree that some of them are genuine, where they say the vast majority are counterfeit. But they say that some of them are genuine. In the forfeiture context, you have district court decisions which say, under those circumstances, the government has to give back the genuine coins. Well, your honor, the vast majority of these coins were indisputably genuine. 99.9918. That's a factual issue. I agree. One of the things that's, you know, we don't know the answer to that. The two, the initial letter and maybe the appeal decision refers to the coins as being counterfeit. Maybe that's a misstatement. I understood that one of the things you want in this case is to get to the place, in this case, where you can test the assertion that any of the coins were counterfeit. And if so, how much? Correct. And you want that under a contract theory. You have two contract theories. Let's just call it one. Nobody thinks there's a difference here between counts two and count three for current purposes. And a regulation theory and a taking theory. Correct. And you say, in fact, I think in your second amended complaint, maybe generously read, but nevertheless, let's assume it says that the Mint was wrong in finding counterfeit. Correct. And that's because the only relief you want, indeed can get, is monetary relief. You can't get these coins back. Absolutely. So it's not an APA claim because it's no equitable relief. It's only monetary relief. And you want an opportunity to test the factual assertion that you made, that the Mint was wrong about finding any of them counterfeit. And if so, how many? Now, let's assume you get to that place. What do you think the regulations say about... Obviously, they don't say they're going to return the counterfeit. Do you think that the regulations impliedly or expressly say you do get back coins that are not counterfeit and if they are no longer returnable because they've been melted and put to other government use, you get some amount of money, like the designated rates? Well, under the hypothetical, if some portion of the Portland Mint's coins were used to manufacture a new coin roll, and therefore we would argue there was some determination by the Mint that they were authentic, because certainly they're not going to use counterfeit coins to manufacture genuine new U.S. coinage. Under that... I'm sorry, this may be a detour, but why is that, of course? I mean, the metal may be perfectly usable. Well, then again, it goes to the threshold determination. There's no prohibition on using counterfeit coins to manufacture new coins, right? I would think there would be. You would think there would be? Well, because counterfeit coins would be evidence of a crime, to your honor's point. They're forfeitable, they're seizable. So certainly I don't think the Mint would take the position that they would take counterfeit coins... Well, if the counterfeit coins are forfeited to the Mint, why can't the Mint use them however it wants to, to manufacture new coins, for example? Again, from just a strictly common sense perspective, if the coins were counterfeit, and we don't know how under this hypothetical the coins are counterfeit, whether they were out of tolerance in terms of the metal allocation, if they were counterfeit for some other reason. It certainly strikes me as odd or defying common sense that you would take counterfeit coins and use them to manufacture genuine new U.S. coins. Do I understand on the contract claim that while you say that much of the content of the contract would be determined by the regulations, you don't say that there is a perfect coincidence? So that, for example, part of your contract claim is that Mr. Adams, in accepting these at the furnace door, made a binding promise that since he's about to destroy them, that he must be... that the Mint will, in fact, be paying for at least the portion that is not forfeited, whether or not the regulation says that. Well, I guess... This is meant to be a helpful question. I understand, Your Honor. And so the answer to that question is yes. We're alleging an implied-in-fact contract that is formed against the backdrop of the regulations, 31 CFR 100.11. But we're also alleging, and we have alleged specifically in paragraphs 50 to 57 of the second amended complaint, that there is something more here under, for example, DNN Bank. And what we're specifically alleging is that Anthony Holmes Jr., who had the title material handler supervisor, and I'm stressing the word supervisor for the court, engaged in actually a number of months of back and forth and communications and to some degree negotiations. Does he have authority to make a contract outside of the regulatory context? Again, at this preliminary stage of the proceedings, and I'm stressing the word preliminary stage because it comes directly from this court's decision and Summers Oil, we've alleged more than enough. We've alleged... No, no, no. But what's the answer to my question? I understand the theory that responding to the regulation under Radium Mines creates a contract. Are you suggesting that Mr. Holmes had the authority quite apart from the regulation  No, I would suggest that he had the ability to enter a contract pursuant to the redemption program and the regulations that implement the redemption program. Let me just tell you why that... Well, I'm not quite sure what to make of that. One way of viewing the regulations is that they are simply silent about what happens to unreturnable non-counterfeit coins in a mix. In which case, you wouldn't have a violation of the regulation. You would have something that just wasn't addressed by the regulation. And this is what C6, one through three, because four through six say, we're going to return it. We're going to do what we need to do before we destroy them. And put them to our own use. In that case, you would have this set of events that happened here, not covered by the regulation. But nevertheless, something that I had taken your complaint to be suggesting Mr. Holmes agreed to. Basically, he was willing to take your property, destroy it, without yet knowing how much of it was forfeitable and how much of it was not forfeitable. And therefore, ought generally to be returned to you if it wasn't being taken by the government. And that's a contract over and above the regulation. I mean, have I misunderstood that? No, you haven't misunderstood it. We've tried to make clear in the second amended complaint that the regulations provide the starting point, but not the end point for this implied-in-fact contract. And then you would have to establish, as Judge Dykstra was pointing to, that he actually had authority to do that. Absolutely. There's an element that's very clear. We need to establish implied-in-fact authority. But what we're saying is, at this preliminary stage of the proceeding, we've alleged more than enough to withstand the motion to dismiss. And we cited Summers Oil, which is exactly on point here in many ways, in saying that generalized allegations of authorization liberally construe, that's how this court interpreted this stage of the proceedings, are more than sufficient to survive a motion to dismiss. We have put forward more than generalized allegations in this case. We provided specific facts, specific communications in paragraphs 50 to 57. Well, your allegations about his authority seem to track the cases. But I want to come back to the hypothetical that I was asking about earlier. I'm still not understanding what's supposed to happen where you've got this ad mixture, the coins are submitted, it's not a situation in which the coins are accepted and used to manufacture new coins, and the mint is sitting there and scratching its collective head. What do we do here? We can't return the counterfeit coins. And let's assume it's extremely difficult to separate the counterfeit from the real coins. In fact, so difficult that it's economically impractical to separate them. What's supposed to happen? Under that hypothetical, I think the regulations as they presently exist read that the entire shipment would be forfeitable, if you will, to the mint. Meaning that under the regulations, 31 CFR 100.11, under your hypothetical, which again, I want to stress, are not the facts of this case. I think the entire shipment, if it was impractical, to separate genuine from counterfeit would be forfeited to the mint. Here though, and I just want to stress this. Well, can I just ask, I mean, that's one possibility. Another is that you would read the regulations as implicitly requiring the testing to be done before the destruction. Well, in fact, your honor, I don't mean to cut your honor off. I guess, but on the further hypothetical that it's impractical to separate them, then everything either stays or goes. But I think it's an important point and maybe one that was lost in some of the briefing. If you read the second amended complaint, we've alleged in a number of places two things that bear upon this inquiry. Number one, there was a change in the redemption program in 2010 that required the mint to assay shipments prior to any melt. That was referenced a number of times in the second amended complaint. The other point that I would make factually, and again- I mean, that change occurred before- In 2010, correct. 2010, so you knew about that when you dropped them off the furnace. Correct. We understood, and this is based upon public reporting, because again, we don't have any discovery. But based upon public reporting, the mint assays a shipment prior to any melt, meaning they determine, to Your Honor's point, whether the coins are genuine or counterfeit before melting them. The other point that I would make- No, I'm sorry. I just got confused. What was the status of that temporal point at the time you dropped this off? So we dropped the coins off in August of 2018, eight years later, meaning, again, we don't have any discovery. That's right, and the regulations said that they were supposed to assay first- The regulation- Pre-melt testing. The regulations do not, but based upon public reporting, irrespective of the regulation, or said that they assay the shipment prior to melt, and we allege that in the second amended complaint. The other thing that we alleged in the complaint, which is very important here, is that a significant portion of the shipment that was delivered to Olin Brass in 2018 had already been determined to be genuine by the government, by the Department of Homeland Security in 2016, pursuant to a litigation that the Portland Mint had brought against the Department of Homeland Security and the Mint for failing to allow its shipment out of the port. So at the end of the day, to your Honor's point, this is a case where all that the Mint has alleged at this time, and it's a complete counter-narrative. It came 28 months after the coins had been delivered to Olin Brass that the entire shipment was counterfeit, but only based upon the testing, and this is right in the record. Did they say the entire shipment was counterfeit or just the vast majority of it? They claim based upon the testing of 203 coins, just 203 coins out of a shipment of 425,000 pounds. So 425,000 pounds delivered to Olin Brass. They melted 425,060 pounds. They withheld 35 pounds. So the total was 425,090 pounds. So I'm looking at page 288 of the appendix. This is the letter that everybody seems to agree was received on December 30th of 2020, and the first sentence of the second paragraph on that page says, I have reviewed the test results and find that the testing sufficiently supports a conclusion that the coins you submitted in August 2018 were counterfeit, and I thought there was something similar in the appeal document. I guess on the next page, 290, says the official determination, there's only one conclusion to be drawn, all but an exceedingly small sample of Portland Mint shipment was melted, and I guess this is the appeal. A very high percentage of the sample was made by a manufacturer other than the United States Mint. Is that the equivalent of saying all but a very, sorry, is that the equivalent of saying a very high percentage was counterfeit, or is that, does counterfeit, yeah. So certainly my understanding of what was proffered by the government before the Court of Federal Claims is that, and if you look at appendix page 287, so one page before, it talks about the Portland Mint submitting 425,095 pounds. 425,060 pounds were melted and used by the Mint to manufacture new genuine U.S. coins. 35 pounds were retained. Of those 35 pounds, I understand the testing was on the sample. The question is what conclusion was drawn, and it may not matter at this stage because you've challenged this, right? I mean, we don't take this as established truth. You're challenging this in a monetary action. But on the question, do we take it that the Mint has found, or is the government asserting that the Mint has found that all 400 and something thousand pounds were counterfeit? Correct. Or what? The entirety of the shipment the government claims to be counterfeit. Well, that's not how I read it, but I'm not sure that makes a difference. I mean, your position is that whatever part of it was genuine, we ought to be paid for it, right? That is correct. Okay, let's include the questions. Thank you. Let's hear from the government. We'll give you two minutes for rebuttal. Thank you, Judge. Ms. Vicks? Thank you. Good morning. May it please the Court. The Court of Federal Claims dismissal decision in this case. So in the light of radiant minds, I'm baffled as to the government's position that this can't be an implied, in fact, contract. Reading the regulation is defining the terms of the contract to the extent that the regulation has terms in it. How do you distinguish radiant minds? In radiant minds, the regulation said that the United States will perform a contract when it receives a sample of recoverable ore. It actually says purchase contract. The United States will issue a contract if it receives ore that is recoverable. These regulations have no such language in them that the United States intends to form any contract. Is that the only difference? Well, radiant minds, I believe, included written documents as well. And the plaintiff had to send a sample of the ore. And the United States would test that and see if it was, in fact, recoverable. And the full case of radiant minds, the court sustained that there was no contract because the plaintiff had not submitted a recoverable sample. OK, well, let's assume that we think that radiant minds is similar to this case and that if the coins are redeemed or submitted, there's a contract defined by the regulation and perhaps by something else. So if that's the case, why shouldn't they be paid for the portion of the submission that was genuine? Because, Your Honor, the contract says that if a portion, if a submission or any portion of a submission appears to be involved in criminal activity or is evidence of intent to defraud the United States, then they don't redeem at all. So any portion of the regulation both indicates, I think, that no contract would be formed. OK, what's supposed to happen in those circumstances where they submit something which is 50% genuine, 50% counterfeit? If a person submits coins to this program, this entirely discretionary United States Mint program, which is titled Request for Examination of Bent or Partial Coins for Possible Redemption. Well, what's supposed to happen? What do they do? Yeah, so what's supposed to happen is that when they submit under this regulation, they understand they might not get their coins back and they might not be redeemed. And so what's supposed to happen is the Mint, if it determines that a portion of the submission is not redeemable under C6-1-3, it doesn't redeem and it doesn't return. Well, what happens to the coins? The coins are melted. They were delivered to a foundry. I think it's not a mystery that they would be melted when they're delivered to a foundry. So the government can use the genuine coins to make new coins without paying for them? The government accepts the- Yes, no. The government can use the metal. Without paying for it. Under the terms of the regulation, yes, but the regulations don't say anything about use of the metal indicating whether coins are redeemed or not. That doesn't seem very fair, does it? Well, it's the program, it does seem fair because it's the program that the United States Mint has set up in the regulations. And if someone wanted to challenge the reasonableness of these regulations, they could certainly bring that case. So why shouldn't we interpret the regulations to say if they're genuine coins there, half of them are genuine, you use them to create new coinage, you should pay for it. Why shouldn't we construe the regulation that way? Because the plain language of the regulation says otherwise. The plain language- What plain language? The plain language right here that says no redemption will be made when a submission or any portion of a submission- Because you mean that taking the coins and melting them down is not a redemption? Exactly, Your Honor. Redemption is the conclusion reached by the Mint after it submits a submission to this process, which includes taking a sample of the submission, testing that sample, and determining whether the coins are legally redeemable under the regulations. Do you take the position, which would be a dictionary position, that redemption is payment as opposed to anything else like just keeping something? I place something in your trust for a while and you just decide to keep it. Redemption under these regulations is exchange. So to Your Honor's point, the regulations are, I give you a bent quarter that doesn't work anymore and you give me a quarter back one for one if it meets the conditions of the regulation. Now, for instance, it could be an authentic quarter and if you intentionally mutilated it, it's not suitable for redemption. So what would you call it? You keep the coins, you melt them down, you use them, you say that's not a redemption. What is it, a forfeiture? It would be a forfeiture under the forfeiture statute and under the case law. Okay, and the cases under the forfeiture statute as I read them say, you can't do that. You've got to give back the genuine coins and you didn't do that. Well, there's no obligation under the regulations to separate out genuine from counterfeit coins. The regulations clearly state if a portion of the submission demonstrates an attempt to defraud the United States or a submission appears to be part of any criminal activity. If a submission contains any counterfeit coins- But it doesn't say you can keep the coins, melt them down and make new coins out of them. It doesn't say that. It doesn't say that those are prerequisites to finding redemption. It doesn't say anything about melting or using the coins. Right, so that happened here. We've got to figure out what the consequence of doing that is. No, the consequence of submitting coins to this program if they are counterfeit at all- They become forfeited? Is that they are forfeit. Yeah, but that's not- And the mint does not redeem under the terms of- That's not what the forfeiture statute says, at least as construed by some of these district court cases. But the regulations say that redemption is denied under the circumstances. It doesn't say you can keep the coins and use them either. It doesn't say that the mint is going to return them. When it says redemption is denied, it's saying we won't pay you. The regulation doesn't say, by virtue of your having given this stuff to us in order for us to decide whether to pay you, we will keep it. I think it's implicit in the regulation. In C6, 1 through 3, there's no provision for returning any coins that are denied redemption. It just doesn't say. It doesn't say, dear world, if you drop this stuff off and we find any of these three conditions, right, material misrepresentation, that we will keep the material. It doesn't say that. It doesn't say we will keep that. It just says we won't pay for it. It says we won't pay for it. Right, so we have- But it also doesn't say that we will separate out every single coin. It might be, as was discussed earlier, it might be impractical or impossible to separate, but that seems like a kind of a remedy issue. No, I disagree, Your Honor, because if we go back to 31 CFR 100.11a, any submission under this subpart shall be deemed an acceptance of all provisions of this subpart. If a person submits coins to this program, it is on notice that it may not get paid and it may not get its coins back. It accepts that. Those are the terms of the regulations. Where does it say it's not getting the coins back? The genuine part? There's no provision for returning coins if redemption is not made. Okay, so it doesn't say it. It doesn't say it. Well, since it does say that coins will be returned under provisions four, five, and six of C6, and it doesn't say under one, two, and three, it's a fair implication that they will not be returned if redemption is denied under those conditions. Mr. Barton made some reference to, I think he said a 2010, I'm going to use the word publication, that as I understood him, he indicated that there was some pronouncement or something issuing from the Mint saying we will do the testing before we destroy them. By destroy, I mean melt and then use the metal. I think he said he makes that allegation in the second amended complaint. Sure, I can address that. Whatever the Mint said in 2010 about if it tests assays before melting them, the regulations here, which were issued in 2018, do not say that the Mint will test prior to destruction, and the regulations here are what govern. I know the Mint has, as we laid out in our brief, and we did brief below, or laid out in the brief below, the Mint suspended the program in 2018 because it was concerned that there was counterfeiting operations, and it opened the program in 2018 with part of the reason for the revision of the regulations was to try to enhance their ability to detect counterfeits. And so if the Mint previously had a policy of testing before melting, I'm not sure what the exact publication was that Mr. Bartan was referencing, but the regulations that issue here, or the regulations that govern here, simply say that the Mint may take samples, may test, and may deny redemption under six specific circumstances, and impliedly will not return the coins if it's denied under three circumstances. Does the 35-pound sample still exist? Do you know the answer to that question? Yes, it does. Okay, anything further? Unless the court has additional questions, then I ask that the court affirm the dismissal of this case. Okay, thank you. Mr. Bartan? So just briefly, two points. So first, although much of this is focused on the regulation, and I understand the court's questions about the regulations, I don't want to lose sight, Judge, of I think something that was implicit in your questioning. The vast majority of these coins are gone. They were taken for a public purpose. So even putting the regulation aside, this is a paradigmatic physical taking, at least with respect to the 425,060 pounds that the Mint indisputably has taken and used for public benefit. The coins are in our collective pockets at this point. The other point coming back to the regulation that I would leave the court with is 31 CFR 100.11D, and D speaks about the U.S. Mint will redeem, will redeem, require to redeem. Now, there's much discussion about what does redemption mean under the regulation. My definition, the Portland Mint's definition of redeem is the same definition that's been proffered by Treasury OIG, because although we don't have discovery in this case, the government did append to its papers an OIG report that was authored by Treasury OIG in August of 2020 about the redemption program. And on appendix page 605, there is discussion about what OIG witnessed at Olin Brass in August of 2018. And the very first bullet, I'm just going to read into the record, very first black bullet on 605. Treasury OIG observed the redemption and recycling of coins redeemed through the Mint's coin exchange programs at Olin Brass from July 31st, 2018 through August 2nd, 2018, which included obtaining coin samples from the redemption. So the 35 pounds of coin samples that we're talking about, according to Treasury OIG, appendix page 605, that is from the redemption of the Portland Mint's coins on August 1st and 2nd of 2018. Under the will redeem language of 100.11d, the Portland Mint is clearly entitled to payment at the published rates for what the Mint took and used. Yeah, one question. Does knowledge and intent play any role here? In other words, does it make a difference if the submitter of the coins knows that they're counterfeit or is ignorant of the fact that it's counterfeit? Well, I think this sort of would get to an innocent owner defense that's applicable in the civil asset forfeiture context. So I think that knowledge would play in because your honor's point, if you're talking about coins that are genuine coins, they're not forfeitable because a civil asset forfeiture action is brought against the property itself. And under, I think it's 18 U.S.C. 982 or 983, if I'm remembering correctly, there is an innocent owner defense in the law. So if the participant in the program did not know that the coins were counterfeit... I was thinking more in terms of the regulations they're dealing with here, which list fraud and criminal activity as a separate category. I think it certainly would play in. I'd have to think more about how precisely it would play in. But there's no question here, just given the fact that the Port Lament has twice sued the government, once in 2016, now again here, that there is no knowledge or belief or anything on the part of the Port Lament that these coins are counterfeit. We wouldn't be here otherwise. Okay. Anything further? Okay, thank you very much. Thank you, Your Honor. I thank both counsel. The case is submitted.